In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-19-00119-CR**
_____

**BRENDA AMAZE UHUNMWANGHO, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 75th District Court**
**Liberty County, Texas**
**Trial Cause No. CR33117**

**MEMORANDUM OPINION**

Appellant Brenda Amaze Uhunmwangho appeals the trial court's denial of her motions to suppress. In a single issue, she argues that *Carpenter v. United States*, 138 S. Ct. 2206 (2018) applies to this case, and she contends the State's warrantless search of a database of stored photos of license plates taken by license plate reader cameras on Highway 59 violated her Fourth Amendment rights. We affirm.

1

## Background

A grand jury indicted Uhunmwangho for money laundering in an amount of $150,000 or more but less than $300,000, with an allegation of a prior felony conviction. According to the officers who testified at the suppression hearings, Uhunmwangho was initially stopped for speeding on Highway 59, the police questioned Uhunmwangho and learned from her that she had just traveled to and from Memphis, Tennessee, and she showed signs of nervousness, and gave the officers inconsistent information, and the Officers asked her for permission to search her vehicle and she consented to the search.[1] The police also ran her license plate through the license plate reader database and obtained a photograph of her license plate. After searching her vehicle, a large amount of cash was discovered hidden in a secret compartment of Uhunmwangho's vehicle.

In Uhunmwangho's first motion to suppress she argued that the traffic stop that resulted in her arrest was not supported by a warrant or probable cause, that her detention after the police discovered she had no outstanding warrants was unconstitutional, and that her vehicle was illegally searched without a warrant. The court held a hearing on the initial motion to suppress and denied the motion.

---

[1] Uhunmwangho argued in her first motion to suppress that she did not consent to the search, but she does not make this argument on appeal.

Uhunmwangho filed a second motion to suppress and an amended second motion to suppress, restating her original arguments, and also arguing that law enforcement's use of license plate reader cameras is an unconstitutional violation of privacy. The trial court held another hearing on the second and amended second motion and denied the motion. Thereafter, the United States Supreme Court issued its opinion in *Carpenter v. United States*, in which the Court held that CSLI (cell-site location information) records carry an expectation of privacy and the Fourth Amendment requires that law enforcement must generally obtain a search warrant supported by probable cause for CSLI associated with a history of the user's physical location. *See* 138 S. Ct. at 2221. Uhunmwangho filed a motion for reconsideration requesting that the trial court reconsider its ruling in light of *Carpenter*, and the trial court denied the motion to reconsider. Uhunmwangho then pleaded guilty, and the trial court sentenced her to ten years' imprisonment suspended for eight years of community supervision. This appeal followed.

On appeal, Uhunmwangho argues in a single issue that the trial court erred in denying her motions to suppress and that "the use of the license plate reader was a search" that was done without a warrant and without exigent circumstances. According to Uhunmwangho, while she was being questioned after the initial traffic stop, the officer "had no reasonable suspicion of any criminal activity being afoot[.]"

3

Uhunmwangho argues that because the officer lacked reasonable suspicion, he searched the license plate reader information to see when Uhunmwangho's car had passed through the area. Uhunmwangho argues that the photos taken by the license plate reader cameras "give[] rise to location at a particular time much like the cell tower gave location information in *Carpenter*[]" and that "people maintain a legitimate expectation of privacy in the record of their physical movement."

The State responds that Uhunmwangho failed to establish that she had an expectation of privacy in her movements while driving on public roads. The State further argues that because a police officer's observation of a license plate that is viewable on a public street would not constitute a search, then the use of a license plate reader to "enhance" an officer's observation should not cause the observation to become a search for the purposes of the Fourth Amendment.

First Suppression Hearing

Testimony of Deputy Timothy Niemeyer

Deputy Niemeyer testified that on June 7, 2016, he stopped Uhunmwangho after he observed her vehicle on Highway 59 appear to be speeding—an assessment that he based on numerous traffic stops he had conducted and his experience observing vehicles traveling at a speed that he thought were speeding that he later confirmed by radar. According to Niemeyer, his radar confirmed that

4

Uhunmwangho was traveling at a speed of seventy-one miles an hour, and the speed limit in the area was sixty-five miles an hour. After activating his lights, he pulled Uhunmwangho over for speeding, but he agreed he did not give Uhunmwangho a ticket for speeding. Niemeyer identified State's Exhibit 1 as a video recording made from his vehicle's in-dash or in-car camera and that the recording was an accurate depiction of events that day, and State's Exhibit 1 was played. Niemeyer testified that the traffic offense of speeding occurred before the video started.

After the stop, Uhunmwangho produced her driver's license to Niemeyer and Niemeyer observed luggage sitting in the second row of the vehicle, which he regarded as "a little suspicious[.]" After a few minutes, Deputy Fasolino arrived at the scene, and Niemeyer showed Uhunmwangho's driver's license to Fasolino to conduct an in-car computer check on the validity of her license and whether there are any "wants or warrants." Niemeyer agreed that Uhunmwangho told him she had gone to Tennessee for three or four days but testified that Uhunmwangho later denied that she had been to Memphis for three to four days and told Niemeyer that she had driven to Memphis that morning. Niemeyer testified that, in his experience working in interdiction, Memphis is sometimes "a destination city for contraband[,]" Houston is "known as a hub for narcotics[]" and "a source destination city for drugs to go to

5

from Houston[,]" and a typical route from Houston to Memphis would be Highway 59.

At one point during the playback of the video, Niemeyer explained that a clicking sound was the mouse for his in-car computer, and he testified that he was "accessing the license plate readers that we have in Liberty County on U.S. 59 [that] capture license plates [and] the reader with cameras [] documents the time it crossed and the date that it crossed." According to Niemeyer, he accessed information from the license plate readers "through the company's Web site where the information is stored." Niemeyer testified that

> we have two license plates readers, one for the northbound lanes and one for the southbound lanes. The northbound lane reader is located on U.S. 59 northbound I would say right around the 105 turnaround where you turn around to go back south to take 105.

Niemeyer testified that the northbound license plate readers had observed Uhunmwangho's license plate earlier that morning. State's Exhibit 2 was admitted into evidence, which Niemeyer agreed was a true and accurate depiction of what he saw when he checked license plate information for Uhunmwangho's vehicle. Exhibit 2 was titled "LEARN Detection Record Detail" and the report also portrayed the names "Law Enforcement Archival & Reporting Network" and "Vigilant[.]" Niemeyer testified that the license plate reader reported that Uhunmwangho's vehicle crossed the area at 1:00 a.m. on June 7, 2016, and that he made the traffic

stop about 9:00 p.m. the same day. Niemeyer agreed that at that point he believed that something other than a speeding violation had occurred.

Niemeyer testified that dispatch provided vehicle information for the license plate, and Niemeyer also requested criminal history information. Niemeyer agreed that the inquiry determined Uhunmwangho was "clear of warrants[.]" According to Niemeyer, Uhunmwangho was "very nervous" when he was speaking with her, she rubbed her face, and she "was breathing very hard, breathing very fast." Based on his training and experience, he regarded Uhunmwangho's rubbing her face, playing with her hair, and muscle twitches as signs of stress. Niemeyer also agreed that, by the time he got the results from the license plate reader, he believed that Uhunmwangho had told him something that was not true.

According to the deputy, Uhunmwangho told him "You can go ahead and search the vehicle[]" and at no time did she ever withdraw her consent. Niemeyer testified that neither he nor Deputy Fasolino exhibited any force, threat, or coercion against Uhunmwangho. Niemeyer testified that during the search of Uhunmwangho's vehicle, he found: "[f]ive large gallon size zip lock bags containing a large amount of U.S. currency [] contained in a hidden aftermarket compartment that was built into the vehicle." The officers seized the money and the vehicle, and Niemeyer took photos of the vehicle and the money. Niemeyer testified that at that

7

point, Uhunmwangho was detained for suspicion of being involved in criminal activity.

Testimony of Deputy Stefan Fasolino

Stefan Fasolino, an officer with the Galveston Police Department, testified that on June 7, 2016, he was a deputy with the Liberty County Sheriff's Office and he had worked in criminal interdiction. Fasolino testified that he rode with Sergeant Niemeyer that day in the same vehicle. According to Fasolino a "quick turn-around trip" from one place to another with a short stay before returning is a "clue" that some criminal activity was going on.

Fasolino testified that Niemeyer stopped Uhunmwangho for speeding. As the video in State's Exhibit 1 was played, Fasolino identified a point where Niemeyer handed him Uhunmwangho's driver's license, and Fasolino testified he then went to the patrol vehicle to check the computer. According to Fasolino, the TCIC and NCIC systems did not show any warrants for Uhunmwangho, and the driver's license appeared to be valid. Fasolino also identified a point in the video where Niemeyer "was going over the plate scans[]" on the computer in his vehicle. At another point in the video, Fasolino explained that he could hear Uhunmwangho say "You can search the vehicle." Fasolino denied exhibiting any force or coercion or drawing his

8

weapon, pepper spray, or handcuffs, and he testified that Uhunmwangho never withdrew her consent.

The trial court asked the prosecutor when during the events captured on the video on State's Exhibit 1 were the results of the license plate readers obtained, and Deputy Fasolino explained that at about four-and-a-half to five minutes into the video Deputy Niemeyer obtained the license plate reader results. Fasolino also agreed that at about four minutes into the video, he had received information from TCIC and NCIC that Uhunmwangho did not have any warrants and her license was valid. According to Fasolino, Niemeyer had asked dispatch to run Uhunmwangho's license plate prior to pulling Uhunmwangho over, and he obtained the results of the license plate reader cameras after pulling Uhunmwangho over.

The trial court denied the motion to suppress and added:

> If there is an issue to be addressed in this case, that issue may be the license plate reader itself and the manner of its use by law enforcement and the extent to which it may violate a fundamental constitutional right; that is, to travel about the United States freely without suspicion . . . .

Second Suppression Hearing

At the hearing on Uhunmwangho's second motion to suppress, defense counsel stated the issue was whether "the license plate reader that the county has on Highway 59 in the Cleveland area is a violation of the Fourth Amendment right of privacy." According to the defense, the police used the license plate readers

9

unconstitutionally and would not have been able to get a warrant because the officer "wouldn't have been able to state specifically what crime had taken place[,]" and the use of the license plate readers was a "fishing expedition." Defense counsel agreed it was not revisiting whether there was probable cause for the initial detention.

Testimony of Officer Paul Young

Officer Paul Young testified that on June 7, 2016, the Liberty County Sheriff's Department owned and operated two license place readers in the county. According to Young, the readers attempt to take a photo of every license plate that passes through the reader's location, then the photos are saved of the vehicle and license plate, and then sent to Vigilant Solutions, and law enforcement has access to the stored information. Young testified that typically the plate readers "show[] a pattern sometimes of where the vehicle goes to and travels" and the data is used for recovery of stolen vehicles, warrants, Amber alerts, missing persons, and interdiction. Young further testified that some tow trucks have plate readers. According to Young, the information stored in the Vigilant system is accessed through the internet using pass codes.

On cross-examination, Young testified that no notice is posted on Highway 59 about the cameras and that travelers do not consent to their use nor contract with Vigilant. According to Young, the only information stored is a photograph of the

10

vehicle and license plate, and the system does not store names or addresses. Young testified that when a person is pulled over, the officer can run the driver's license through the state system, but the Vigilant system is a different system, although the Vigilant system is "tied to the DPS state system[]" and can provide an alert if a vehicle has been reported stolen. Young agreed it is not against the law for a person to lie about where they have traveled.

In announcing its ruling from the bench, the court stated that the State's use of license plate readers was troubling, but the court denied the motion and stated:

> . . . The question is [whether] it [is] constitutionally incorrect to engage in this practice.
>
> I cannot equate any right of privacy in and to a license plate. It is no different than an officer taking a photograph of an individual to show that an individual was at a particular location.
>
> That does not involve a constitutional invasion of rights of privacy because anything you display to the public at large is subject to being photographed. The problem would come in[,] in my opinion[,] in the use of this data.
>
> If law enforcement used this data solely to support a reasonable suspicion for the initial detention, then I think we may have a serious issue to be argued about.
>
> We don't have that in this case because reasonable suspicion was supported and found in the last hearing, and that is exceeding the speed limit. I don't see a Fourth Amendment issue, and I don't see a constitutional issue.
>
> Had it been that the argument being that the data and how law enforcement used this data rather than acquiring this data, we may have a different situation. Law enforcement did not rely solely on this data to justify the initial detention of your client.

11

## Standard of Review

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). We review the trial court's factual findings for an abuse of discretion but review the trial court's application of the law to the facts de novo. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013).

At a suppression hearing, the trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony, and a trial court may choose to believe or disbelieve all or any part of a witness's testimony. *Valtierra*, 310 S.W.3d at 447; *Wiede v. State*, 214 S.W.3d 17, 24-25 (Tex. Crim. App. 2007) (quoting *State v. Ballard*, 987 S.W.2d 889, 891 (Tex. Crim. App. 1999)); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). When reviewing a trial court's ruling, the appellate court does not engage in its own factual review. *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007). We give almost total deference to the trial court's determination of historical facts, "especially if those are based on an assessment of credibility and demeanor." *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010). We give the same deference to the trial court's conclusions with respect to mixed questions of law and fact that turn on credibility or demeanor. *State v. Ortiz*, 382 S.W.3d 367, 372 (Tex. Crim. App. 2012). We

review purely legal questions de novo as well as mixed questions of law and fact that do not turn on credibility and demeanor. *State v. Woodard*, 341 S.W.3d 404, 410 (Tex. Crim. App. 2011); *Crain*, 315 S.W.3d at 48.

When, as here, there are no findings of fact and none were requested, an appellate court must presume that the trial court implicitly resolved all issues of historical fact and witness credibility in the light most favorable to its ultimate ruling. *State v. Elias*, 339 S.W.3d 667, 674 (Tex. Crim. App. 2011) (citing *Ross*, 32 S.W.3d at 857). We will uphold the trial court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case. *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014); *Arguellez v. State*, 409 S.W.3d 657, 662-63 (Tex. Crim. App. 2013); *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006).

Traffic stops require an officer to have a reasonable suspicion that the person detained is, has been, or will soon engage in criminal activity. *Jaganathan v. State*, 479 S.W.3d 244, 247 (Tex. Crim. App. 2015); *Crockett v. State*, 803 S.W.2d 308, 311 (Tex. Crim. App. 1991). The standard is whether, based on facts articulated by the officer and the totality of the circumstances, an objectively reasonable officer would have developed suspicion that an offense was in progress or had occurred. *See Martinez v. State*, 500 S.W.3d 456, 465 (Tex. App.—Beaumont 2016, pet. ref'd)

(citing *Ford v. State*, 158 S.W.3d 488, 492-93 (Tex. Crim. App. 2005)). We review de novo "whether the totality of [the] circumstances is sufficient to support an officer's reasonable suspicion of criminal activity." *Crain*, 315 S.W.3d at 48-49.

Expectation of Privacy

"Whether society is willing to recognize a particular set of circumstances as involving a reasonable expectation of privacy has always been treated as a question of law by the United States Supreme Court." *Villarreal v. State*, 935 S.W.2d 134, 146 (Tex. Crim. App. 1996) (Keller, J., concurring). "[A]n accused has standing to challenge the admission of evidence obtained by an 'unlawful' search or seizure only if he had a legitimate expectation of privacy in the place invaded." *State v. Betts*, 397 S.W.3d 198, 203 (Tex. Crim. App. 2013) (citing *Rakas v. Illinois*, 439 U.S. 128, 139 (1978)). Because she has greater access to relevant evidence, a defendant who challenges a search has the burden of proving facts establishing a legitimate expectation of privacy. *Villarreal*, 935 S.W.2d at 138.

Under the privacy-based model of the Fourth Amendment set forth by *Katz v. United States*, a person has standing to contest a search when the person has a legitimate expectation of privacy in the space being invaded by government agents. *See* 389 U.S. 347, 350-51 (1967); *see also Rakas*, 439 U.S. at 149; *Granados v. State*, 85 S.W.3d 217, 222-23 (Tex. Crim. App. 2002). A defendant has the burden

14

to prove that a legitimate expectation of privacy existed, and must do so by demonstrating that (1) by her conduct, she exhibited an actual intention to preserve something as private, and (2) this subjective expectation of privacy is one that society is prepared to recognize as reasonable. *State v. Granville*, 423 S.W.3d 399, 418 (Tex. Crim. App. 2014) (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979); *Oles v. State*, 993 S.W.2d 103, 108 (Tex. Crim. App. 1999)). Factors courts use in deciding whether a person has a reasonable expectation of privacy in the place or object searched include: (1) whether the defendant had a proprietary or possessory interest in the place or object searched; (2) whether the defendant's presence in or on the place searched was legitimate; (3) whether the defendant had a right to exclude others from the place or object; (4) whether the defendant took normal precautions, prior to the search, which are customarily taken to protect privacy in the place or object; (5) whether the place or object searched was put to a private use; (6) whether the defendant's claim of privacy is consistent with historical notion of privacy. *See id.* at 407-08 (citing *Granados*, 85 S.W.3d at 223).

## Analysis

The officers testified that two license plate reader cameras on Highway 59 in Liberty County took photographs of vehicles' license plates, that the images were stored by Vigilant Solutions, and that law enforcement could access the photographs

15

by use of log-in pass codes. In this case, Officer Niemeyer's search of the Vigilant Solutions database yielded a photograph of Uhunmwangho's vehicle taken at about 1:00 a.m. in the morning on June 7, 2016, and Uhunmwangho was stopped for speeding at about 9:00 p.m. on June 7. Uhunmwangho argues that the search of the third-party Vigilant Solutions database violated her Fourth Amendment rights because "people maintain a legitimate expectation of privacy in the record of their physical movement." Therefore, she must demonstrate that she has an expectation of privacy in the photographs of her license plate that were stored in the Vigilant Solutions database.

A car's license plate is exposed to public view. The license plate displayed on a vehicle while traveling on a public roadway is not typically an area where a person has a reasonable expectation of privacy, and we conclude that taking a picture of a license plate displayed on a vehicle that is traveling on a public road would not be subject to Fourth Amendment protection nor would it constitute a search. *See Katz*, 389 U.S. at 351; *Michalec v. State*, No. 03-11-00104-CR, 2013 Tex. App. LEXIS 6431, at **10-11 (Tex. App.—Austin May 24, 2013, no pet.) (mem. op., not designated for publication) (citing *Wood v. State*, 632 S.W.2d 734, 741-42 (Tex. Crim. App. 1982); *Turner v. State*, No. 05-99-01246-CR, 2000 Tex. App. LEXIS 7746, at *2 (Tex. App.—Dallas Nov. 15, 2000, no pet.) (mem. op., not designated

16

for publication)). On this record, we cannot say that Uhunmwangho has demonstrated any conduct by her that exhibited "an actual intention to preserve [] as private[]" a photograph of her vehicle and its license plate taken while she was driving on Highway 59. *See Granville*, 423 S.W.3d at 418.

Uhunmwangho does not challenge the license plate reader taking a picture of her license plate on the public highway, but she argues that a warrant was required for a search of the license plate photo database because the license plate readers in this case, like the cell-phone location data in *Carpenter*, store data that then produces a record of her location and that is something in which she has a privacy interest. In *Carpenter*, the defendant was charged with six counts of robbery and six counts of carrying a firearm during a federal crime of violence. *See* 138 S. Ct. at 2212. Among the evidence prosecutors obtained from the cell phone carrier by subpoena were "12,898 location points" from Carpenter's cell phone records that catalogued Carpenter's movements. *See id.* From this evidence, the FBI produced a map that placed Carpenter's phone near four of the charged robberies. *See id.* at 2212-13. The Supreme Court held that the Government's acquisition of the cell-site records was a search within the meaning of the Fourth Amendment for which a warrant supported by probable cause was required. *See id.* at 2220-21. The Court explained:

> Mapping a cell phone's location over the course of 127 days provides
> an all-encompassing record of the holder's whereabouts. As with GPS

17

> information, the time-stamped data provides an intimate window into a person's life, revealing not only his particular movements, but through them his "familial, political, professional, religious, and sexual associations." These location records "hold for many Americans the 'privacies of life.'"
>
> . . .
>
> A cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales.

*Id.* at 2217-18 (citing *Riley v. California*, 573 U.S. 373, 403 (2014); *Katz*, 389 U.S. at 415). The Court concluded that the retrospective quality of cell phone location data creates the ability to reconstruct a person's movements and possibly results in "tireless and absolute surveillance." *Id.* at 2218.

By contrast, the Court explained, "'[a] car has little capacity for escaping public scrutiny.'" *Id.* (quoting *Cardwell v. Lewis*, 417 U.S. 583, 590 (1974) (plurality opinion)). "What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection." *Katz*, 389 U.S. at 351. In *Chaney v. City of Albany*, No. 6:16-CV-1185, 2019 U.S. Dist. LEXIS 143055 (N.D.N.Y. Aug. 16, 2019), the trial court faced a Fourth Amendment challenge concerning fixed license plate readers that recorded twenty-four hours a day. *Id.* at **21-22. Chaney alleged that the use of cameras throughout the city operated like a tracking device, which resulted in a "'massive invasion of [his] privacy.'" *Id.* The New York federal court noted that

18

courts have consistently upheld the use of license plate readers and similar technology by law enforcement agencies. *Id.* at **22-23.[2] The court explained:

> Because the purpose of a license plate is to readily facilitate the identification of the registered owner of the vehicle for the administration of public safety, a person has no reasonable expectation of privacy in the information acquired by the State for this purpose and contained in a law enforcement or DMV database.

*Id.* at *23 (quoting *People v. Bushey*, 29 N.Y.3d 158, 163 (2017)). The New York federal court noted that the fixed cameras "indiscriminately recorded 24-hours a day, without any particular focus on specific individuals," and because Chaney had no reasonable expectation of privacy in his license plate information while traveling on public roads, no Fourth Amendment violation had occurred. *Id.* at **25-26.

A Vigilant Solutions license plate reader system was also challenged in *United States v. Yang*, No. 2:16-cr-231-RFB, 2018 U.S. Dist. LEXIS 11967 (D. Nev. Jan. 25, 2018). In that case, the license plate readers were mounted on tow trucks,

---

[2] *See, e.g.*, *United States v. Miranda-Sotolongo*, 827 F.3d 663, 668 (7th Cir. 2016) ("Because the police conducted a check of a database containing only non-private information and did so using only registration information that could be seen by any member of the public, the police did not conduct a Fourth Amendment search."); *United States v. Diaz-Castaneda*, 494 F.3d 1146, 1152 (9th Cir. 2007) (stating that "when police officers see a license plate in plain view, and then use that plate to access additional non-private information about the car and its owner, they do not conduct a Fourth Amendment search."); *United States v. Ellison*, 462 F.3d 557, 563 (6th Cir. 2006) ("Thus, so long as the officer had a right to be in a position to observe the defendant's license plate, any such observation and corresponding use of the information on the plate does not violate the Fourth Amendment").

vehicles used by repossession companies, and law enforcement vehicles that drove around the city. *Id.* at **4-5. The Nevada federal district court explained:

> The observations of license plate locations noted in the [Vigilant] database do not rely upon invasive technology allowing law enforcement officers to essentially peer into the private property of individuals. The [Vigilant] database relies upon random observations of license plates by digital cameras placed on tow trucks or other vehicles for repossession companies and on some law enforcement vehicles. The digital cameras capture images of license plates when the vehicle with a mounted camera drives past or near another vehicle with a license plate. The program is not designed to and does not track an individual's movements or an individual automobile's movements continuously or even regularly. The program does not permit a law enforcement client to direct that a vehicle with a [Vigilant] digital camera follow and continuously record the location of a particular automobile. The [Vigilant] database can but does not regularly provide contemporaneous location information.
>
> [][T]he Court finds that the technology associated with the digital camera for [Vigilant] does not permit advanced or invasive surveillance of individuals or individual automobiles. The [Vigilant] digital cameras do not have the capability of capturing images through solid barriers such as walls erected to protect the privacy of personal property or individual movements. The technology does not have the capability of taking photos of license plates from a significant distance—that is beyond two to three standard lanes of a street. The cameras cannot be readily or easily manipulated while the vehicle upon which the camera is mounted is moving.
>
> [][T]here is no evidence in this case to suggest that law enforcement officers used the [Vigilant] database to regularly or continuously monitor the movements of Yang[.]
> . . .
> [T]he Court does not find that there was any form of "electronic trespass" that might implicate a reasonable expectation of privacy. The location information in this case was not generated by Yang

20

electronically or digitally surrendering private or confidential information to a third-party working in cooperation with law enforcement. The location information for the [vehicle] was not identified by use of any invasive digital technology regarding its whereabouts or those of Yang. The location information was obtained through random observation(s) recorded on public streets.

*Id.* at \*\*15-16, 18-19. The Nevada federal district court concluded that the officers had not used an invasive vehicle location tracking technology for which a warrant was required. *Id.* at \*\*14-15.

On this record, we cannot say that the trial court erred in concluding that Uhunmwangho failed to demonstrate that she had a privacy interest in the retrieval of the data and a photograph of Uhunmwangho's license plate and vehicle when it was traveling on Highway 59. The trial court did not err in concluding that no warrant was required.[3] We find *Carpenter* factually distinguishable. *Carpenter* involved a search of the information generated by Carpenter's personal cell phone over a lengthy period of time that was then used to reconstruct Carpenter's movements and location. Here, the police stopped Uhunmwangho for speeding and visually observed the license plate on her vehicle, and then the police ran her license

---

[3] Uhunmwangho did not make a trespass argument nor does she assert any challenge under the Texas Constitution or under any other provision of the United States Constitution. *Cf. United States v. Jones*, 565 U.S. 400, 404-05 (2012) (a plurality of the Supreme Court ruled that the physical attachment of a GPS tracking device on Jones's automobile was a trespass, and an unconstitutional search).

21

plate in the license plate reader database and retrieved a single photograph taken while Uhunmwangho was driving on a public roadway. Therefore, we find *Carpenter* factually distinguishable.[4]

That said, even assuming without deciding that Uhunmwangho had a privacy interest in the photograph retrieved from the license plate reader, Uhunmwangho herself told Niemeyer that she had driven to Memphis that morning. Niemeyer testified that he stopped Uhunmwangho for speeding, that Uhunmwangho displayed signs of nervousness, and that Uhunmwangho initially lied about her trip. Based on his experience working in interdiction, Niemeyer had suspicions because Uhunmwangho had indicated she just returned from Memphis, which he testified is "a destination city for contraband[.]" Uhunmwangho then consented to the search of her vehicle, and she does not challenge the search of her vehicle in this appeal. A traffic violation committed in an officer's presence is sufficient to authorize an initial traffic stop. *See Walter v. State*, 28 S.W.3d 538, 542 (Tex. Crim. App. 2000). And consent to search is one of the well-established exceptions to the constitutional

---

[4] *See also Sims v. State*, 569 S.W.3d 634, 645-46 (Tex. Crim. App. 2019) (examining *Carpenter* and concluding that appellant did not have a reasonable expectation of privacy in his physical movements or location as reflected in less than three hours of real-time CSLI records the police accessed by pinging appellant's phone fewer than five times) (citing *Carpenter v. United States*, 138 S. Ct. 2206, 2014-2021 (2018)).

requirements of both a warrant and probable cause. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *Meekins v. State*, 340 S.W.3d 454, 458 (Tex. Crim. App. 2011); *Hubert v. State*, 312 S.W.3d 554, 560 (Tex. Crim. App. 2010).

On this record, we cannot say the trial court erred in concluding that no Fourth Amendment violation occurred and that, based on the totality of the circumstances, the officers had reasonable suspicion based on articulable facts that would reasonably lead them to conclude that Uhunmwangho was, had been, or would soon be engaged in criminal activity. *See Ford*, 158 S.W.3d at 492-93.

We overrule Uhunmwangho's issue and affirm the trial court's judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on February 25, 2020
Opinion Delivered March 25, 2020
Do Not Publish

Before McKeithen, C.J., Horton and Johnson, JJ.